# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

In the Matter of the Search of: )
)
A Verizon Wireless cellular telephone assigned number ) Case No. 18-m-021
**520-353-6265** and used by Christopher L. Childs )
)
)
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

**A Verizon Wireless cellular telephone assigned number 520-353-6265 and used by Christopher L. Childs**

over which the Court has jurisdiction pursuant to Title 18, United States Code, Sections 2703 and 2711, there is now concealed:

**Evidence of a crime, namely violations of Title 18, United States Code, Section 1591**

The basis for the search under Fed. R. Crim P. 41(c) is:
☒ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: Title 18, United States Code, Section 1591

The application is based on these facts: See attached affidavit.

☒ Delayed notice of 30 days (give exact ending date if more than 30 days:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Heather Wright, Special Agent (FBI)
*Printed Name and Title*

Sworn to before me and signed in my presence:
Date: Feb. 9, 2018

_____
*Judge's signature*

City and State: Milwaukee, Wisconsin       David E. Jones, U.S. Magistrate Judge
*Printed Name and Title*

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Heather Wright, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number **520-353-6265** (the "Target Cell Phone"), whose service provider is Verizon Wireless, a wireless telephone service provider headquartered in Basking Ridge, New Jersey. The Target Cell Phone is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2. I am a Special Agent with the Federal Bureau of Investigation, and I have been so employed since July 2010.

3. I am currently assigned to the Wisconsin Human Trafficking Task Force, which investigates the illegal trafficking of persons for the purposes of labor and commercial sex acts. I gained experience in the conduct of such investigations through prior investigations, formal training, and in consultation with law enforcement partners employed by local, state and federal law enforcement agencies. Prior to my assignment with the Milwaukee Division of the FBI, I was employed in the pharmaceutical manufacturing industry as a Programmer Analyst for web applications from September 1999 through March 2001 as well as an Automation Engineer from June 2003 through July 2010.

4. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law

enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, Section 1591 (sex trafficking by force, fraud, or coercion), have been committed, are being committed, and will be committed by Christopher L. Childs (b. 1972) and others. There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations, and will lead to the identification of additional individuals who are engaged in the commission of these offenses.

## PROBABLE CAUSE

6. The FBI and other law enforcement partners are investigating CHRISTOPHER L. CHILDS and others for using force, fraud, and coercion to cause victims to engage in commercial sex acts. The investigation to date has included traditional law enforcement methods, including, but not limited to: interviews with confidential sources and sources of information; information from other law enforcement officers; documentary evidence; pen register, trap and trace, and telephone toll data; recorded telephone calls and text messages with targets, physical surveillance, and a court-authorized, consensual wiretap of a confidentuial source's phone.

7. On May 17, 2017, I received information that Victim 1, an adult female, had reported to law enforcement that between October 31, 2015 and May 15, 2017, CHILDS had forced and coerced her to be involved in commercial sexual activity. He also repeatedly physically and sexually assaulted her. Victim 1 explained that CHILDS was a pimp and that

2

CHILDS regularly forced Victim 1 to perform prostitution dates at various strip clubs, including TNT in Lebanon, Wisconsin, and The Hardware Store, in Clyman, Wisconsin. CHILDS also forced Victim 1 to perform prostitution dates at The Chicken Ranch, a brothel located in Nevada, and had attempted to force Victim 1 to perform prostitution dates at The Geisha House, which purports to be a massage parlor in Madison, Wisconsin. Victim 1 explained that CHILDS demanded that all proceeds from the prostitution dates as well as any proceeds made from dancing at the strip clubs be provided to him.

8. On May 19, 2017, FBI Task Force Officer (TFO) Neal Lofy and I spoke with Victim 1. Victim 1 explained that she met CHILDS in late 2013 or early 2014, at Hammering Hank's, a bar located in Hartford, Wisconsin. Approximately a year and a half later, while at the same bar, CHILDS asked Victim 1 to go to a strip club with him. As they were walking into the club, CHILDS told Victim 1 that people already thought that Victim 1 worked for him and told Victim 1, "Here's what we do." Victim 1 then realized that CHILDS was a pimp and that he was asking Victim 1 to dance and perform sex acts for money. CHILDS then introduced Victim 1 to an additional female working for him, hereinafter "Victim 2." At the time, Victim 1 was working as a Certified Nursing Assistant (CNA). However, Victim 1 eventually agreed to dance at the strip club on the weekends.

9. According to Victim 1, CHILDS initially allowed her to keep money from the paychecks she received from working as a CNA and only demanded that she give CHILDS the money earned at the strip clubs. However, soon after she began dancing, CHILDS told Victim 1 that he would be taking "everything." CHILDS told Victim 1 that he would give Victim 1 any money only he felt she needed it. Over time, CHILDS continued to reduce the amount of money he would provide for needed personal expenses.

3

10. Victim 1 also explained that CHILDS had her take out a loan in her name in order to buy CHILDS a truck. CHILDS told Victim 1 that his "other girls" could not get a loan because Victim 1 was the only female he had with a legit job and earning a paycheck. When Victim 1 moved into an apartment in which she resided untuil she left CHILDS in May 2017, CHILDS had her take a $4500 title loan out on the truck to pay her rent and security deposit. Soon after she left CHILDS, he defaulted on the truck loan, and the truck was repossessed.

11. Victim 1 explained that in approximately February of 2016, she stopped working as a CNA and began working for CHILDS full time. After Victim 1 began working for CHILDS on a full time basis, CHILDS became sexually abusive to her.

12. CHILDS also soon became physically abusive to Victim 1. In July of 2016, CHILDS began hitting Victim 1. The first time CHILDS hit Victim 1 was in his car on the way home from playing poker. CHILDS, a pimp Victim 1 knew as "BALL" (an individual known to law enforcement as KENDRICK A. HAYDEN (b. 1979)), and others would play poker every Tuesday night. During such a game, Victim 1 made a negative comment about JENNIFER CAMPBELL. Victim 1 was aware that CAMPBELL was CHILDS' "bottom" or most-trusted prostitute, and the mother of two of CHILDS' children. When CHILDS and Victim 1 got into their car after the game, CHILDS punched Victim 1 numerous times in the head. Victim 1 described this as "wailing on her."

13. Victim 1 reported that CHILDS was always violent to his girls when he drank. Victim 1 reported that Victim 2 would always have bruises on her body. Victim witnessed CHILDS beat Victim 2 on one occasion, and on other occasions, Victim 2 told Victim 1 what had happened. Victim 2 also told Victim 1 that CHILDS was sexually abusive to her.

4

14. Victim 1 explained that CHILDS controlled every aspect of her life. CHILDS had rules about everything, including how the apartment had to look and how clean it needed to be. Six months prior to Victim 1 leaving CHILDS, CHILDS became very strict about what Victim 1 ate. Victim 1 was not allowed to eat fast food, and if she wanted to eat something, CHILDS would have to tell her yes or no, even if she was with her sister or her mother. Victim 1 had to tell CHILDS where was going to be at all times and if she visited anyone, such as her sister, she would have to send pictures constantly to CHILDS to prove to him that she was where she said she was.

15. Victim 1 explained that although CHILDS occasionally set up dates for Victim 1 at customer's homes or in cars, the majority of Victim 1's prostitution dates occurred in the champagne rooms at TNT and The Hardware Store, two strip clubs located in Dodge County, Wisconsin. CHILDS had a good relationship with the managers at the strip clubs and would call them to verify how many dates and how much money Victim 1 made. At the end of every night, CHILDS required Victim 1 and Victim 2 to bring him all of the money that they made.

16. Victim 1 reported that initially, she would have to drop the money off at CHILDS's residence every night on the way home from the strip club. The managers would provide payment to Victim 1 in a sealed envelope. After a while, CHILDS installed a safe within Victim 1's home, and Victim 1 was to lock the envelope inside the safe. Law enforcement has since verified the existence of and photographed this safe.

17. Victim 1 explained that CHILDS had a key to Victim 1's apartment and had the freedom to pick up the money whenever he wished. If any of the money was missing, Victim 1 would be punished. Punishments entailed either physical abuse or sexual torture. CHILDS would

5

make Victim 1 pick her punishment. For example, on at least one occasion, CHILDS punished Victim 1 by forcing her to place a hot curling iron in her vagina.

18. If Victim 1 or Victim 2 got any tips and did not provide them to CHILDS, CHILDS always found out. CHILDS would either play Victim 2 and Victim 1 against each other, lying to them individually in order to get them to tell on one another, or he would call the strip club and ask the managers or bartenders how many times they had entered the champagne rooms. Approximately six to eight months prior to the interview, Victim 1 had attempted to keep $200-$250. CHILDS found out and punished Victim 1 by beating her.

19. Victim 1 reported, and law enforcement has verified, that CHILDS lived with CAMPBELL at 1346 Patton Street in Hartford, Wisconsin. Victim 1 reported that CAMPBELL left CHILDS on a number of occasions, but they always got back together. CHILDS was not as abusive to CAMPBELL; however, Victim 1 knew that CHILDS had hit CAMPBELL in the past. CAMPBELL previously had worked at TNT and the Hardware Store.

20. Victim 1 reported that CAMPBELL was currently working at an Asian massage parlor called the Geisha House in Madison. Sometime in mid-February 2017, CHILDS was sick and told CAMPBELL to take Victim 1 to fill out an application at The Geisha House. Both CAMPBELL and Victim 1 filled out applications. Victim 1 did not get a call back; however, CAMPBELL did. During the course of filling out the application, the owner of the massage parlor told CAMPBELL and Victim 1 that whatever "extras" CAMPBELL and Victim 1 made were CAMPBELL's and Victim 1's to keep, while the owner would receive the price of the massage. The owner also told CAMPBELL and Victim 1 that if the police came, that CAMPBELL and Victim 1 were on their own. The owner took a copy of CAMPBELL and Victim 1's driver's license and asked for CAMBELL's and Victim 1's previous job experience on

6

the application. CHILDS told Victim 1 that CAMPBELL was making approximately between $500 and $1300 a day at The Geisha House.

21. After interviewing Victim 1, other law enforcement and I were able to verify much of Victim 1's statements through additional investigation, including witnesses interviews and phone records. For example, other witnesses have confirmed that employees at TNT handled arrangements for prostitution dates at the club and were aware of CHILDS' role as a pimp. In addition, law enforcement has verified prostitution activity taking place at the The Hardware Store through numerous complaints and law enoforcement contact. In addition, law enforcement has obtained phone records and social media search warrant returns confirming contact between CHILDS and Victim 1, Victim 2, and CAMPBELL. Law enforcement also obtained documentation from a social service agency in which another victim detailed CHILDS' role as her pimp.

22. On January 5, 2018, Victim 1 told me that CHILDS, who remains in contact with Victim 1, now had another female (hereinafter Victim 3) working for him. On January 25, 2018, Victim 1 told me that Victim 3 had confided that said she didn't like the way CHILDS was treating her. Victim 3 also told Victim 1 that CHILDS made Victim 3 call him "Daddy." Victim 1 reported that CHILDS later told Victim 1 that he was leery of Victim 3 because Victim 1 was not there to watch Victim 3.

23. During the night of Saturday, January 27, 2018, Victim 1 called me. She was noticably upset. Victim 1 explained that Victim 3 had called her and was extremely upset because "SCOTTIE" had called CHILDS and told CHILDS that Victim 3 was causing problems with other girls as well as the owner of the Hardware Store. I am aware that SCOTT HOEFT is

7

the manager of the Hardware Store and is known to others as "SCOTTIE." I also have verified through phone records that HOEFT did in fact call CHILDS cell phone that evening as reported.

24. During their call on January 27, 2018, Victim 3 told Victim 1 that CHILDS was sending CAMPBELL to pick up Victim 3 from the Hardware Store. Victim 3 told Victim 1 that the reason that SCOTTIE had called CHILDS was because he had wanted her to go on stage and Victim 3 needed a break. Victim 3 stated that she was exhausted and was only taking a break because CHILDS was making Victim 3 work 15-hour days. Victim 1 stated that following that phone call, Victim 1 spoke to CHILDS. CHILDS said that he was going to pick Victim 3 up from the club and that CHILDS was going to try and make Victim 3 stay and work if he could. CHILDS told Victim 1, "I know the bitch is tired but she needs to make that dough."

25. Following the January 27, 2018 telephone call I received from Victim 1, I contacted the Dodge County Sheriff's Department. Shortly thereafter, a Dodge County Deputy conducted a traffic stop on CHILDS with Victim 3 inside his vehicle.

26. On Saturday, February 3, 2018, I again spoke with Victim 1. Victim 1 stated that Victim 3 had been drunk at a George Webb's restaurant earlier that morning and told two customers that because she gave all her money to CHILDS, she did not have money for the meal she had ordered. Victim 1 had received this information from CHILDS. CHILDS told Victim 1 that he was going to "kill this bitch." Hartford Police were called to George Webb's because Victim 3 attempted to leave the restaurant without paying for her meal. Fearing for Victim 3's safety, Victim 1 anonymously called Hartford Police and told the dispatcher of CHILDS' threats against Victim 3. Victim 3 was cited for obstruction and taken into custody for a short time.

27. I have confirmed the above events with Hartford Police Detective Richard Thickens. Detective Thickens provided reports indicating Hartford Police also spoke with

8

CHILDS that evening near the hotel at which Victim 3 had been staying. CHILDS also told police that the room that Victim 3 was staying, was in his name. At the time, CHILDS was driving a gold-colored, 2014 Catillac XTS bearing Wisconsin license plate 871-ZMZ.

28. Later that day, Victim 1 advised me that CHILDS "had" Victim 3 (in his possession). CHILDS also told Victim 1 that CAMPBELL was "on the same shit" that CHILDS "was on." CHILDS told Victim 1 that CHILDS needed to do what he could to make money and was going to make sure he didn't get caught. Victim 1 believed CHILDS statements to mean that Victim 3's life was at risk. Victim 1 felt that if CHILDS felt threatened in any way, CHILDS would not hesitate to hurt Victim 3. CHILDS told Victim 1 that he didn't trust Victim 3 yet and Victim 1 felt that because CHILDS didn't trust Victim 3, Victim 3 would endure more physical or sexual abuse to ensure Victim 3 did what CHILDS wanted.

29. On Monday February 5, 2018, this writer spoke with Victim 1. Victim 1 stated that she had just gotten off the telephone with CHILDS. CHILDS told Victim 1 that Victim 3 and CHILDS were at a hotel located in Madison, Wisconsin, and that Victim 3 was working at the Geisha House with CAMPBELL all week. CHILDS told Victim 1 that he was staying there until Victim 3 made enough money for them to leave. CHILDS told Victim 1 that he was happy that he was there with Victim 3 so he can watch her at all times. CHILDS would not disclose where in Madison CHILDS was keeping Victim 3 and informed Victim 1 that CHILDS had taken Victim 3's phone. CHILDS also told Victim 1 that he had changed his telephone number in an attempt to avoid law enforcement detection. CHILDS told Victim 1 that his new telephone number was **520-353-6265,** the cell phone for which this warrant seeks location information.

30. Later that same day (February 5, 2018), I again spoke with Victim 1. Victim 1 stated that CHILDS had told Victim 1 that he had to put Victim 3 "in her place." When Victim 1

9

asked what that meant, CHILDS told Victim 1 to "stop being stupid," and that "she knew what that meant." Victim 1 believed, based on her own experiences with CHILDS, that CHILDS meant that he had physically or sexually assaulted Victim 3. CHILDS told Victim 1 that CAMPBELL and CAMPBELL's kids had gone to the hotel to visit CHILDS the night prior and CHILDS told his kids that he had to "lay low." Victim 1 also stated that CHILDS had purchased another cellular phone. CHILDS told Victim 1 to communicate with CHILDS on this new phone only. Victim 1 provided CHILDS's new number as 608-445-4146.

31. On Wednesday, February 7, 2018, Special Agent Jeff Berkley of the Wisconsin Department of Justice, Division of Criminal Investigation, conducted surveillance of the Geisha House. At approximately 8:42 a.m., a Cadillac sedan with very dark tinted side and rear windows pulled into the parking lot. The Cadillac had a Wisconsin license plate of 871 ZMZ. A white female with dark red hair and blonde highlights in her bangs— who matches the general description of Victim 3— exited the front passenger seat and grabbed bags from the rear passenger seat. The female then walked into the side door of the building.

32. Wisconsin DOT records confirmed that license plate 871 ZMZ is assigned to a 2014 Cadillac XTS 4dr sedan registered to CHILDS and CAMPBELL at 1346 Patton Road, in Hartford, Wisconsin.

33. On February 8, 2018, at approximately 1:38 a.m., SA Berkley observed a Cadillac sedan with dark tinted windows park in the parking lot to the house the Geisha House. No one got out of the Cadillac. At approximately 2:00 a.m., a female exited the Geisha House from the side door with bags, walked to Cadillac, and got into the front passenger seat. The Cadillac drove away, and no one else got into the Cadillac. SA Berkley observed the Cadillac as it was driving

10

east on Highway 30 and caught up to the Cadillac once it was heading east on I-94. SA Berkley observed the Wisconsin license plate on the Cadillac as 871 ZMZ.

34. On February 2, 2018, Victim 1 signed consent for a Title III wiretap of her phone in order to capture and record her conversations with CHILDS and Victim 3. An order authorizing the wiretap was signed by the Honorable Judge J.P. Stadtmueller on February 5, 2018, and the wiretap was established on February 6, 2018. The following is a transcribed excerpt of a call between CHILDS and and Victim 1 that was captured on February 9, 2018 at 10:47 a.m.:

Victim 1: I'm guessing that Faith gives you everything

CHILDS: Oh no questions. Faith....religiously. So I'm like, okay, she likes the spot in Madison, you know what I'm saying? She doesn't want to leave. Like, now we talking last night, like before I picked her up and she doesn't want to go to Arizona now....to the Ranch.

Victim 1: Huh, really?

CHILDS: Yeah, she'd rather just stay at the Geisha House. I'm like when you break it down, when you think about it like that...you have, you fuckin' for 100, 200 bucks at the Geisha House. You're not doing that in Madison. I mean Vegas.

Victim 1: Right

CHILDS: In Vegas, you're not giving away pussy for 100, 200 bucks.

Victim 1: No, not at all.

CHILDS: Anyway, you're giving away pussy out there....it's sometimes thousands.

Victim 1: Yep.

CHILDS: And even if the muthfucka pay a thousand just to fuck, you still get $500 of that.

Victim 1: Right, and it's not like it's a long time either.

CHILDS: Yeah, and like, she worked a double. She did, like, 13 programs on Wednesday and that's cool, but that was a double. I mean, like, you fucked 13 people that day. You maybe

11

sucked some, but for the most...13. If you do 13 programs out at, you get 13 rooms out at the fucking Vegas, you get (unintelligible).

Victim 1: You're looking at 10Gs.

35. In my training and experience, I have learned that Verizon Wireless is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate at least two kinds of information about the locations of any cellular telephones sold as of 2003 to which they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

36. Based on my training and experience, I know that Verizon Wireless can collect E-911 Phase II data about the location of the Target Cell Phone, including by initiating a signal to determine the location of the Target Cell Phone on Verizon Wireless's network or with such other reference points as may be reasonably available.

12

37. Based on my training and experience, I know that Verizon Wireless can collect cell-site data about the Target Cell Phone.

## AUTHORIZATION REQUEST

38. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

39. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the Target Cell Phone would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

40. I further request that the Court direct Verizon Wireless to disclose to the government any information described in Attachment B that is within the possession, custody, or control of Verizon Wireless for a time period of 45 days from the date the warrant is signed. I also request that the Court direct Verizon Wireless to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information

13

described in Attachment B unobtrusively and with a minimum of interference with Verizon Wireless's services, including by initiating a signal to determine the location of the Target Cell Phone on Verizon Wireless's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate Verizon Wireless for reasonable expenses incurred in furnishing such facilities or assistance.

41. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Cell Phone outside of daytime hours.

# ATTACHMENT A

## Property to Be Searched

1. The cellular telephone assigned call number 520-353-6265, (the "Target Cell Phone"), whose wireless service provider is Verizon Wireless, a company headquartered at 1 Verizon Way, Basking Ridge, New Jersey 07920.

2. Information about the location of the Target Cell Phone that is within the possession, custody, or control of Verizon Wireless.

# ATTACHMENT B

## Particular Things to be Seized

All information about the location of the Target Cell Phone described in Attachment A for a period of forty-five days from the date the warrant is signed, during all times of day and night. "Information about the location of the Target Cell Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of Verizon Wireless, Verizon Wireless is required to disclose the Location Information to the government. In addition, Verizon Wireless must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with Verizon Wireless' services, including by initiating a signal to determine the location of the Target Cell Phone on Verizon Wireless's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate Verizon Wireless for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).